IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

| | | |
|---|---|---|
| JACK D. STEPHENS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 3:10-cv-267-WHA-CSC |
| | ) | (WO) |
| BOARD OF TRUSTEES OF AUBURN | ) | |
| UNIVERSITY, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

**I.  INTRODUCTION**

This case is before the court on a Motion for Summary Judgment filed by Defendant

Board of Trustees of Auburn University ("Auburn")[1] (Doc. #17).  The Plaintiff, Jack D. Stephens

("Stephens"), filed a Complaint in this case alleging disparate treatment on the basis of gender

under Title VII of the Civil Rights Act, 42 U.S.C. § 2000e, *et seq.*  For the reasons to be

discussed, the Motion for Summary Judgment is due to be GRANTED.

**II.  SUMMARY JUDGMENT STANDARD**

Summary judgment is proper "if there is no genuine issue as to any material fact and . . .

the moving party is entitled to a judgment as a matter of law."  *Celotex Corp. v. Catrett*, 477 U.S.

317, 322 (1986).

---

[1]Auburn asserts, in its Brief in Support of Motion for Summary Judgment and Answer to
the Complaint, that "Auburn University," as opposed to "Board of Trustees of Auburn
University," should be the defendant in this case, because the Board of Trustees of Auburn
University is not a separate legal entity from Auburn University.  Def.'s Mot. In Supp. of Summ.
J. at 2 n.1; Ans. ¶ 6.  Although the Plaintiff has not amended the Complaint, the court will treat
the Order entered in this case as also applying to Auburn University to the same extent as if it
had been specifically named.

The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion," relying on submissions "which it believes demonstrate the absence of a genuine issue of material fact." *Id.* at 323.  Once the moving party has met its burden, the nonmoving party must "go beyond the pleadings" and show that there is a genuine issue for trial. *Id.* at 324.

Both the party "asserting that a fact cannot be," and a party asserting that a fact is genuinely disputed, must support their assertions by "citing to particular parts of materials in the record," or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A), (B).  Acceptable materials under Rule 56(c)(1)(A) include "depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials."

To avoid summary judgment, the nonmoving party "must do more than show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  On the other hand, the evidence of the non-movant must be believed and all justifiable inferences must be drawn in its favor. *See Anderson v. Liberty Lobby*, 477 U.S. 242, 255 (1986).

After the nonmoving party has responded to the motion for summary judgment, the court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).

### III.  **FACTS**

The submissions of the parties establish the following facts, viewed in a light most favorable to Stephens, the non-movant:

## A.     The Structure of Auburn's Office of Development

Stephens began working for Auburn in April 2005 as a development officer.[2] Development officers are responsible for raising money for Auburn.  According to Stephens' job description, a development officer's responsibilities include: (1) identifying potential prospects for fundraising; (2) soliciting donations; (3) acknowledging and showing gratitude for donations; (4) keeping supervisors apprised of goals, status, and plans; and (5) developing reports of fundraising activity.  Stephens Dep. 89:4-16; Stephens Dep. Ex. 11 at 1.  Furthermore, for development officers, "[e]mphasis is centered on clients" who are able to make "major gifts." Stephens Dep. Ex. 12 at 1.  A gift Stephens raised was considered a major gift if it was worth $10,000 or more.  McGinnis Aff. ¶ 3.

All development officers are part of Auburn's Office of Development.  During the relevant times of this case, Dr. Bob McGinnis ("McGinnis"), Auburn's vice president for development, led the Office of Development.  Development officers reported to McGinnis through one of three assistant vice presidents for development.  Additionally, development officers were also supervised by the unit at Auburn for which they worked.  Therefore, each development officer (1) ultimately reported to McGinnis through an assistant vice president for development; and (2) also reported to a unit supervisor.

---

[2]Stephens' official job title was "Development Officer II."  Stephens Aff. ¶ 2.

During his employment, Stephens' work unit was the Jule Collins Smith Museum of Fine Art (the "Museum"). Accordingly, one of his supervisors was the director of the Museum. During his first year, his Museum supervisor was Dr. Michael Panhorst, a male. In April 2006 through April 2007, his Museum supervisors were Dr. Marilyn Laufer, a female ("Laufer"), and Dr. Robert Ekelund, a male. From April 2007 through the date of Stephens' termination, his only Museum supervisor was Laufer. During Stephens' employment, no other development officers worked for the Museum.

As previously noted, Stephens also had to report to McGinnis through an assistant vice president for development. At the relevant times in this case, Stephens reported to assistant vice president Dr. Barbara Miller, a female ("Miller").

Development officers, such as Stephens, are assisted by development coordinators, who help the development officers with administrative matters. Stephens Dep. at 49:9-20. One of the development coordinator's responsibilities is to assist development officers in inputting fundraising data into Auburn's Prospect Management System ("PM2"). *See, e.g.*, Stephens Dep. at 50:4-8. However, Auburn told Stephens on several occasions that ultimately, it was his responsibility to ensure that his development coordinator properly entered his data into PM2. *See, e.g.*, Stephens Dep. Ex. 12 at 1; Stephens Dep. Ex. 13 at 1; Stephens Dep. Ex. 15 at 10.

**B.      Stephens' 2005 Employment**

When Stephens began working for the Museum in April 2005, he replaced Carol Ann Fowler ("Fowler"). Fowler was the Museum's prior development officer, and had raised $8,478,000 in the first four months of 2005.

4

In August 2005, Stephens completed a performance planning worksheet with his supervisors.  In this worksheet, Stephens was instructed to, among other things, obtain donations from three prospective donors, who were named on his worksheet, and was assigned a goal of raising $500,000 in 2005.  Stephens was also required to "[p]rovide information necessary to your coordination/support staff member in order for them to maintain the validity of the prospect management system [PM2] on a monthly basis with 100% accuracy."  Stephens Dep. Ex. 12 at 1.

In December 2005, Stephens met with his supervisors to review his performance.  In Stephens' first evaluation, he received a rating of 3.5 on a rating scale of 1 to 5, and his supervisors listed several areas of deficiency.  Stephens' deficiencies included: (1) failing to raise any money in 2005; (2) failing to ensure that his fundraising data was properly entered into PM2; and (3) failing to make a sufficient number of solicitations.  Stephens Dep. Ex. 13 at 1-2.

## C.    Stephens' 2006 Employment

Stephens and his supervisors met again in December 2006 to review his performance for that year.  In his performance review, Stephens received some positive comments.  Stephens identified, contacted, and evaluated approximately 20 new potential major gift donors, though he was expected to meet with 24 that year.  Stephens Dep. Ex. 15 at 2.  Stephens also completed more than a sufficient number of "'meaningful' prospect/donor visits per month," "moves with major gift prospects/donors," solicitations, and follow-ups.  Stephens Dep. Ex. 15 at 3.

Overall, however, the performance review was negative.  Stephens received the lowest possible overall performance score.  According to the performance review, Stephens' "greatest weakness . . . was bringing in gifts for the museum . . . [o]ur tracking system indicates that there were *no major gifts generated during the performance period for 2006*."  Stephens Dep. Ex. 15

5

Case 3:10-cv-00267-WHA-CSC   Document 42   Filed 03/02/11   Page 6 of 22

at 16 (emphasis added). Stephens' performance review also emphasized his failure to properly use PM2, as multiple areas of his performance review critiqued the fact that his fundraising activity was not documented on PM2, and further directed Stephens to "instruct [his] coordinator in keeping [his] PM2 system up-to-date." Stephens Dep. Ex. 15 at 12. This performance review set, as one of Stephens' "development plans" for 2007, a goal for Stephens to "[r]eview PM2 procedures with staff." Stephens Dep. Ex. 15 at 10.

Stephens' performance review stated that it had no record of Stephens raising any major gifts in 2006. In fact, reading the facts in the light most favorable to the non-movant, Stephens raised approximately $462,850 in major gifts, though this amount was short of his "major gift goal" of $1,400,000 for 2006. *See* McGinnis Dep. 48:20-51:1; Stephens Dep. Ex. 15 at 3. The reason that his performance review made no mention of this amount is because Stephens' supervisors did not know about this fundraising activity at this time, due to the fact that it was not entered into PM2. Stephens Dep. at 52:15-23; 57:9 - 58:23; 61:23-63:9.[3] Significantly, Stephens, in brief, states that McGinnis did not know about this information until no earlier than April of 2008, one month before Stephens was fired.[4] *See, e.g.*, Pl.'s Opp'n to Def.'s Mot. for

---

[3]Stephens discovered this discrepancy in 2008, before he was terminated. He testified in his deposition that he was unaware of the fact that he was not credited for raising this money in 2006, despite signing his 2006 performance review stating that he raised no money in 2006. Stephens Dep. at 52:15-23; 57:9 - 58:23; 61:23-63:9. Stephens stated that he did not remember telling Laufer, Miller, or McGinnis about this information before he was terminated, though he states that he told his "coordinator, Cindy Cox" about this discrepancy prior to his termination. Stephens Dep. 61:23-63:9.

[4]Stephens implies that his supervisors should have known that he raised the $462,850 at issue because he "was the only development officer for the museum, . . . any monies raised by Plaintiff would have shown up on . . . [the] overall gifts and commitments for [the Museum in] 2006." Pl.'s Opp'n to Def.'s Mot. for Summ. J. at 7; Stephens. Dep. at 55:9-56:17. However, Stephens admitted that "not all gifts are cultivated and solicited. Some just come in." Stephens Dep. at 56:21-23. In any event, whether or not Stephens' supervisors knew that he raised the

Summ. J. at 18 ("[McGinnis] conceded, however, that his office had [the relevant] information *as early as* April of 2008.") (emphasis added).

## D.       Stephens' 2007 Employment

Stephens and his supervisors met again in December 2007 to review his performance for that year.  Stephens received some positive comments in this review: (1) he exceeded the required number of contacts with prospects and donors, Stephens Dep. Ex. 18 at 2; (2) he met the requirements for stewardship with donors, Stephens Dep. Ex. 18 at 3; and (3) he appeared to work well with others, Stephens Dep. Ex. 18 at 5, 7.

However, Stephens received the second-lowest overall rating in this performance review. The review emphasized that Stephens continued to have problems raising funds and ensuring his information was accurately entered into the PM2 system.  In fact, Stephens raised only $184,326 for 2007, despite the fact that his goal was to raise $1,250,000.  Stephens Dep. Ex. 18 at 2-3. Additionally, the performance review emphasized that Stephens "continues to struggle with the PM2 system."  Stephens' Dep. Ex. 18 at 2.

## E.       Auburn Places Stephens on Probation

Beginning in November 2007, just before Stephens' December 2007 performance review, McGinnis, Miller, and Laufer met with Stephens and placed him on probation for the next 90 days.  They stated as their reason for doing so:

---

alleged amount from 2006 at some point prior to terminating Stephens, this amount was below the $1,400,000 Stephens was expected to raise in that year.  Additionally, this is only one of many pieces of evidence relevant to Auburn's termination decision.

> We are concerned about the level of your development fundraising production
> during the past $10^1/_2$ months. You have continued a poor performance trend that
> was identified in your 2006 performance review. The trend has continued
> through 2007. There has been no reported production since the second quarter of
> this year for the Gift and Commitment report. Because we are nearing the end of
> the [fundraising] campaign, this is a serious concern for the museum.

Stephens Dep. Ex. 16 at 1.

As part of probation, Stephens' supervisors established a performance improvement plan for Stephens to follow during this period. This plan listed several goals that Stephens needed to accomplish in his probationary period: (1) "[b]uilding a cash endowment for the museum;" (2) obtaining "[c]ash [s]ponsors for the exhibits[;] and" (3) obtaining "[c]ash [s]ponsors for the newsletter." Stephens Dep. Ex. 16 at 1. The plan emphasized that "[t]he greatest need of the museum is cash." Stephens Dep. Ex. 16 at 1.

Stephens' performance improvement plan also gave Stephens five "accountability recommendations:" (1) meet monthly and jointly with Laufer and Miller; (2) during the meetings, report fundraising activities and accomplishments, and complete the "Monthly Meeting Form" and "Top 25 Prospect form;" (3) produce weekly travel plans on the Friday before the following week's trip; (4) complete contact reports properly; and (5) request any training necessary to improve performance. Stephens Dep. Ex. 16 at 1-2.

The performance improvement plan further stated that "[t]he purpose of this probation is to create a sense of urgency on your part so we can (1) raise the remaining $1,149,254 remaining on the museum campaign goal by March 2008, (2) increase the giving of prospects/donors and have a steady flow of gifts coming into the museum on a monthly, quarterly, and annual basis." Stephens Dep. Ex. 16 at 2. Finally, the plan stated that "[F]ailure to show significant

improvement during the 90 day period may result in a recommendation for termination." Stephens Dep. Ex. 16 at 2.


**F.     Auburn Extends Stephens' Probation**

After the end of Stephens' 90 day probationary period, Laufer and Miller met with Stephens on March 10, 2008, and decided not to remove his probationary status.  While Stephens met many of his performance improvement plan requirements,[5] his supervisors concluded that he "did not display the required . . . sense of urgency to raise cash gifts for the museum."  Stephens Dep. Ex. 19 at 1.  Specifically, Stephens raised $56,206 in December 2007, $15,194 in January 2008, and $0 in February 2008, for a total of $71,400 during his 90 day probationary period. Stephens. Dep. Ex. 19 at 1.  Stephens raised "no gifts specifically for the newsletter support, endowments, or sponsors for exhibits."  Stephens Dep. Ex. 19 at 1.  Stephens' supervisors concluded that Stephens "has shown little improvement during the probationary period.  The amount of gifts raised and his poor documentation of efforts to raise gifts during the probationary period are consistent with his past performance.  The probationary goals were not met and we recommend that the next step is to begin with the process for dismissal."  Stephens Dep. Ex. 19 at 1.  Miller testified that, during this time period, Stephens had shown improvement in using that PM2 system, though she explained that this was only because "he had not put *anything* in for 2005, 2006, and [200]7."  Miller Dep. at 37:3-38:9 (emphasis added).

─────────────────

[5]Stephens argues that Laufer and Miller improperly concluded in their report summarizing this meeting that Stephens failed to submit travel plans in a timely matter or attend additional training.  Pl.'s Opp'n to Def.'s Mot. for Summ. J. at 3.  In its Reply brief, Auburn has agreed to accept this fact as true.  Def.'s Reply in Supp. of Mot. for Summ. J. at 1-2 n.1.  The court concludes that this is not a material fact in this case, as it is not a necessary part of the similarly situated analysis discussed below.

Stephens next met with McGinnis.  McGinnis decided not to terminate Stephens at this time, but instead extended Stephens' probationary period until March 31, 2008.  In March, Stephens raised a larger amount of money than usual.  By March 31, Stephens had raised a total of $395,044 during the first quarter of 2008, made up of $248,944 in non-cash planned gifts, $125,000 in major gifts, and another gift of $1,100.  McGinnis Aff. ¶ 38.  Stephens was not terminated on March 31, 2008.

**G.     Auburn Disciplines Stephens for Speaking to Donors About his Treatment at Work**

Subsequently, Stephens went on a trip to Houston and met with a married couple, Al and Jule Smith.  Al and Jule Smith are important donors to the Museum; in fact, the Museum is named after Jule Smith.  They also serve on the Museum's Advisory Board.  While on this trip, Stephens stated to the couple that "I felt like I was being treated differently than other development officers and, I felt, being targeted."  Stephens Dep. at 129:7-11.  Laufer subsequently learned of Stephens making this statement, and met with him on March 27, 2008 to reprimand him for it.  She summarized in a memorandum that

> I told you at that time that though I understood your feelings of frustration and extreme anxiety over the situation that you are presently in, you had completely stepped outside of appropriate protocol . . . . I reminded you at that time that AU Provost, Dr. Heilman had specifically stated . . . . that such behavior would not be tolerated . . . . [and] was considered insubordination. . . . I told you at this meeting that though I would not act on this at this time you needed to understand the gravity of your actions and if at any time in the future this recurred it would result in immediate dismissal.

Stephens Dep. Ex. 20 at 2.

**H.     Auburn Terminates Stephens**

On May 15, 2008, Stephens met with Laufer and Miller.  They discussed concerns they

had with Stephens' performance.  On May 21, 2008, Laufer and Miller wrote a memorandum to

Stephens terminating his employment.  Stephens Dep. Ex. 21 at 1-2.  This letter stated four

problems with Stephens' employment: (1) he failed to meet fundraising campaign goals; (2) he

failed to raise cash for the museum newsletter, special exhibits, and endowments; (3) he failed to

consistently provide proper documentation of fundraising efforts through contact reports; and (4)

he told Al and Jule Smith that he felt that he was being treated unfairly by Auburn.  Stephens

Dep. Ex. 21 at 1.  While McGinnis made the ultimate decision to terminate Stephens, Stephens

asserts, and Miller stated, that McGinnis simply ratified the decision of Miller and Laufer.

Miller Dep. at 30:1-23.

After his termination, Stephens filed a charge of discrimination with the EEOC.  After

the EEOC determined that Stephens' gender discrimination claim could not be substantiated,[6]

Stephens filed a Complaint in this court.


## IV. <u>DISCUSSION</u>

Stephens alleges that he was discriminated against on the basis of his gender, male, in

violation of Title VII.  Auburn argues that it is entitled to summary judgment because Stephens

cannot satisfy his prima facie case of gender discrimination.  Specifically, Stephens fails to

identify any similarly situated females who engaged in nearly identical conduct as Stephens yet

---

[6]Stephens posits that the EEOC found his claim meritless because Auburn stated that
Stephens raised zero dollars in 2006, when Stephens in fact raised money in that year.  Pl.'s
Opp'n to Def.'s Mot. for Summ. J. at 3.  Whether or not the EEOC would have changed its
decision if Auburn had presented it with different dollar figures is irrelevant to this court's
current determination.

were not fired.  In the alternative, Auburn argues that it has shown legitimate, nondiscriminatory reasons for terminating Stephens, and that those reasons are not a pretext for discrimination.  The court concludes that Stephens fails to satisfy his prima facie case, and therefore, summary judgment is due to be granted.

Title VII prohibits an employer from discriminating "against any individual with respect to his compensation, terms, conditions, or privileges of employment because of such individual's race, color, religion, sex or national origin." 42 U.S.C. § 2000e-2(a)(1).  The critical element in establishing wrongful discrimination in violation of Title VII is discriminatory intent.  *See St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506 (1993).  Such discriminatory intent can be established through (1) statistical proof of a pattern of discrimination; (2) direct evidence of discrimination, which consists of evidence that, if believed, would prove the existence of discrimination without inference or presumption; or (3) circumstantial evidence of discriminatory intent using the framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973).  *See Holifield v. Reno*, 115 F.3d 1555, 1561-62 (11th Cir. 1997).

Where, as here, Stephens seeks to prove intentional discrimination on the basis of gender by using circumstantial evidence of intent, the court applies the framework first set out by the United States Supreme Court in *McDonnell Douglas*.  Under this framework, the plaintiff must establish a prima facie case of discrimination.  *McDonnell Douglas*, 411 U.S. at 802.  After the plaintiff has established a prima facie case of discrimination, the burden of production is placed upon the employer to articulate a legitimate nondiscriminatory reason for its employment action.  *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254 (1981).  The plaintiff may seek to demonstrate that the proffered reason was not the true reason for the employment decision "either directly by persuading the court that a discriminatory reason more likely motivated the

employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Id.* at 256; *Combs v. Plantation Patterns*, 106 F.3d 1519, 1528 (11th Cir. 1997). A plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 147 (2000).

### A.       Prima Facie Case

A plaintiff's prima facie case for a discharge-discrimination claim must show the following elements: (1) the plaintiff is a member of a protected class; (2) the plaintiff was qualified for the position at issue; (3) the plaintiff was discharged despite his qualification; and (4) the plaintiff was subject to differential treatment, that is, he was either (a) replaced by someone who was not a member of the plaintiff's protected class or (b) a similarly situated employee who was not a member of the protected class engaged in nearly identical conduct and was not discharged. *Nix v. WLCY Radio/Rahall Commc'ns*, 738 F.2d 1181, 1185 (11th Cir. 1984); *Holifield*, 115 F.3d at 1562. In this case, Auburn does not contest the first three elements, and Stephens does not contend that he was replaced by a female.

Accordingly, to determine whether Stephens has satisfied his prima facie case, this court must evaluate whether Stephens can point to any similarly situated females who engaged in nearly identical conduct and were not terminated. To determine whether Stephens meets this requirement, this court must "evaluate 'whether the employees are involved in or accused of the same or similar conduct and are disciplined in different ways . . . . the *quantity and quality* of the comparator's misconduct must be nearly identical to prevent courts from second-guessing employers' reasonable decisions and confusing apples with oranges.'" *Burke-Fowler v. Orange*

*Cnty., Fla.*, 447 F.3d 1319, 1323 (11th Cir. 2006) (emphasis added) (quoting *Maniccia v. Brown*, 171 F.3d 1364, 1368 (11th Cir. 1999)).[7]

Under the reasoning of Eleventh Circuit precedent, if objective evidence shows that a plaintiff previously performed poorly or committed prior misconduct, that fact is relevant for purposes of determining whether other employees are similarly situated to the plaintiff. For example, in *Cooper v. Southern Company*, the Eleventh Circuit held that employees were inappropriate comparators when they, unlike the plaintiff, had "*no* record of disciplinary problems." 390 F.3d 695, 741 (11th Cir. 2004), *overruled on other grounds*, *Ash v. Tyson Foods, Inc.*, 546 U.S. 454, 457 (2006) (emphasis in original); *Silvera v. Orange Cnty. Sch. Bd.*, 244 F.3d 1253, 1259 (11th Cir. 2001) (holding that employees were not similarly situated because the plaintiff had been arrested two to four more times than his would-be comparator); *Maniccia*, 171 F.3d at 1369 (holding that a female plaintiff who committed at least four policy violations was not similarly situated to employees who each committed a single policy violation); *cf. Jones v. Bessemer Carraway Med. Ctr.*, 137 F.3d 1306, 1313 (11th Cir. 1998) ("Plaintiff's multiple instances of misconduct on the same day may simply have been 'the straw that broke the camel's back.'"), *superseded in other part by* 151 F.3d 1321. In fact, the Eleventh Circuit has suggested that employees may be inappropriate comparators if one has been placed on a disciplinary program, such as probation, and the other has not. *Cooper*, 390 F.3d at 741

---

[7]Although some cases in the Eleventh Circuit suggests that a plaintiff need only prove that a comparator engage in "similar," as opposed to "nearly identical" misconduct, the Eleventh Circuit recently clarified that the "nearly identical" standard is the proper one. *Burke-Fowler*, 447 F.3d 1319, 1323 n.2 ("[W]e are bound to follow *Maniccia*'s "nearly identical" standard . . . because when a later panel decision contradicts an earlier one, the earlier panel decision controls.") (citing *Walker v. Mortham*, 158 F.3d 1177, 1188-89 (11th Cir.1998)); *see also Walton-Horton v. Hyundai of Ala.*, No. 10-10147, 2010 WL 4121303, at *3 (11th Cir. Oct. 21, 2010) ("[W]e are bound by the 'earliest case' doctrine to use the 'nearly identical' standard").

(noting that neither of two inappropriate comparators, unlike the plaintiff, had been placed on a disciplinary program).

The fact that employees work for different supervisors is also relevant to the similarly situated analysis. On one hand, the fact that two employees work under different supervisors does not mean, as a matter of law, that the two employees are not similarly situated. *See, e.g.*, *Anderson v. WBMG-42*, 253 F.3d 561, 565-66 (11th Cir. 2001). On the other hand, the Eleventh Circuit has emphasized that "differences in treatment by different supervisors or decision makers can *seldom* be the basis for a viable claim of employment discrimination." *Silvera*, 244 F.3d at 1261 n.5 (emphasis added).

1.    *Stephens' Comparators are not Similarly Situated*

Stephens initially presented a list of 27 comparators. *See* Stephens Dep. at 38:15-21; Pl.'s Opp'n to Def.'s Mot. for Summ. J. at 27-36. Stephens has since conceded that six of these individuals are not proper comparators. *See* Pl.'s Opp'n to Def.'s Mot. for Summ. J. at 32-35. This leaves 21 proffered comparators, all of whom, like Stephens, were development officers at Auburn during the first quarter of 2008. Stephens contends that these comparators are similarly situated to him because they were development officers during the first quarter of 2008. Stephens asserts that because these employees raised less money (or a smaller percentage of their assigned goal) than Stephens did in the first quarter of 2008 and were not fired, these allegedly similarly situated female comparators were treated better than he was, on the basis of gender.

Stephens' argument for why these comparators are similarly situated to him is unduly narrow, because the relevant conduct in this case is not merely the amount of money that Stephens raised in 2008. There are four key reasons for why Stephens is not similarly situated to

15

his comparators.  First, Stephens was on probation in 2008 as a result of his past performance, and Stephens did not identify a single comparator whom he alleges was on probation during that time.  Second, while Stephens was told that his performance was lacking because he failed to raise a sufficient amount of money from 2005-07 and failed to ensure his data was properly entered into PM2, Stephens presented no evidence that any of his comparators had fundraising problems prior to 2008 or PM2 problems.  Third, Stephens presented no evidence that any of his comparators complained about their job situation to important Auburn donors such as Al and Jule Smith.  Fourth, Stephens had a different supervisor than all of his comparators, because he was the only development officer who worked for the Museum.  Therefore, he was the only development officer who reported to the director of the Museum.

Stephens attempts to argue that these distinguishing factors are irrelevant.  Stephens claims that any PM2 problem he had is a "red herring" with respect to the similarly situated analysis because "[b]y the time of Plaintiff's termination, he was no longer having problems" with PM2.  Pl.'s Opp'n to Def.'s Mot. for Summ. J. at 24.  Stephens also notes that McGinnis stated, in his deposition, that Stephens was not the only development officer who had difficulty entering information into the PM2 system.  McGinnis Dep. at 37:7-22.[8]  This argument is due to

---

[8]Stephens takes McGinnis's statement that some individuals did not satisfactorily input their data into PM2 and were not terminated out of context.  When read in context, McGinnis emphasized that Stephens' PM2 deficiencies were not normal:

> Q:    Weren't there problems with the PM2 System with lots of the development officers?
>
> A:    No.
>
> Q:    So, all of the development officers entered all of their contacts, their solicitations, their donations into the PM2 System in a timely fashion?
>
> A:    I didn't say that.
>
> Q:    Okay.  So Jack wasn't the only development officer who didn't completely utilize the PM2 system to your satisfaction; is that a fair statement?

be rejected. Whether or not Stephens improved his PM2 performance has nothing to do with the fact that he had poor past performance, and that he, unlike his proffered comparators, was treading on "thin ice" as a result of his poor past performance with PM2. Additionally, McGinnis did not identify any of Stephens' comparators as having trouble with PM2, and thus, his general statement is not useful in analyzing Stephens' comparators.

Stephens also claims that his PM2 deficiencies are irrelevant because it was his development coordinator's responsibility, not his responsibility, to enter information into PM2. This argument is meritless. Stephens was told on multiple occasions that it was *his* responsibility to ensure that his data was entered properly into PM2. Stephens Dep. Ex. 12 at 1 (stating, in Stephens' 2005 performance planning worksheet, that Stephens must "[p]rovide information necessary to your coordination/support staff member in order for them to maintain the validity of the prospect management system [PM2] on a monthly basis with 100% accuracy"); Stephens Dep. Ex. 15 at 12 (critiquing Stephens, in his 2006 performance review, for poor PM2 performance while directing him to "instruct [his] coordinator in keeping [his] PM2 system up-to-date;" and to "[r]eview PM2 procedures with staff" due to his prior deficiencies);

---

A:      I don't think I'd call that a fair statement.
Q:      Okay. Well, I asked you if all the other development officers entered their
        contacts, their solicitations, their donations generated in the PM2 System, you
        said you didn't say that. So there were more development officers who didn't --
               MR. WALKER: Object to the form.
Q.      -- other than Jack?
A.      What you said was, every time at all times. I think it's fair to say that there were
        development officers who may not have put into the PM2 System every time at
        all times.
Q.      And every development officer who failed to do that [was] terminated?
A.      No.

McGinnis Dep. 36:15 - 37:22.

Stephens Dep. Ex. 18 at 2 (stating, in Stephens' 2007 performance review, that Stephens "continues to struggle with the PM2 system").  While Stephens' development coordinator may have been responsible for physically typing the data into PM2, there is no issue of fact that Stephens bore the ultimate responsibility for ensuring his PM2 data was accurate.  Stephens cannot simply declare that his employer cannot assign him this responsibility.

Stephens further contends that the fact he complained to Al and Jule Smith about the way Auburn treated him at work is irrelevant in the similarly situated analysis because (1) it was not the reason put forward for his termination; and (2) if that reason had been sufficient to terminate him, Auburn would have done it as soon as it found out about Stephens' behavior.  Pl.'s Opp'n to Def.'s Mot. for Summ. J. at 25.  This argument is due to be rejected.  First, the memorandum Stephens received when he was terminated explicitly stated that one of the reasons he was being terminated was for this act.  Stephens Dep. Ex. 21 at 1.  Second, in any event, Stephens cannot deem evidence irrelevant because it did not result in his immediate termination or because Auburn did not specifically state that it was terminating Stephens for this reason.  As previously discussed, past misconduct is relevant for purposes of the similarly situated analysis.  *Cooper*, 390 F.3d at 741.  Auburn treated Stephens' behavior toward the Smiths as misconduct.  Laufer explicitly reprimanded Stephens for his conduct, and stated that such behavior was insubordination and would not be tolerated.  Stephens Dep. Ex. 20 at 2.  The fact that Laufer decided to not terminate Stephens immediately shows, at most, leniency, not irrelevance.

Stephens finally complains that it would be unfair to distinguish him from his comparators due to the fact that he, unlike any of the other development officers, was supervised by the director of the Museum.  He writes that "[t]o accept Defendant's position would allow it to discriminate against any development officer who is solely responsible for a particular unit

18

without regard to how a given person performs in comparison to his or her fellow development officers - a convenient precedent to establish." Pl.'s Opp'n to Def.'s Mot. for Summ. J. at 26. This argument is due to be rejected. The court agrees with Stephens that a difference in supervisors does not mean, as a matter of law, that employees are not similarly situated. *See, e.g.*, *Anderson*, 253 F.3d at 565-66. However, a difference in supervisors *is* a relevant and important factor in analyzing comparators. *Silvera*, 244 F.3d at 1261 n.5 ("[D]ifferences in treatment by different supervisors or decision makers can seldom be the basis for a viable claim of employment discrimination"). Additionally, there are a number of distinguishing characteristics between Stephens and his comparators besides a mere difference in supervisors, as just discussed.[9]

2.    *Stephens' Closest Comparator, Hope Butler, is not Similarly Situated*

The most similar of Stephens' proffered comparators is Hope Butler ("Butler"). Butler, a development officer, raised zero dollars in the first quarter of 2008, like Stephens, who raised little money in 2007. Like Stephens, Butler was placed on probation in the following year. During her probationary period, in 2009, Butler raised zero dollars, which is less than the amount Stephens raised during his probationary period. Ultimately, Butler resigned from Auburn prior to termination.

---

[9]Because this court cannot consider subjective evaluations in the similarly situated analysis, *see Vessels v. Atlanta Indep. Sch. Sys.*, 408 F.3d 763, 769 (11th Cir. 2005) this court does not rely on the subjective ratings Stephens received on his performance reviews, such as numerical ratings. The court can rely, however, on the objective facts that Stephens raised an insufficient amount of money, failed to properly use PM2, and committed misconduct by complaining to donors.

Although Butler was placed on probation like Stephens was, she is not an adequate comparator, even assuming that her resignation from Auburn was not tantamount to being terminated by Auburn and that her past fundraising results were "nearly identical" (or worse) as compared with Stephens.  This is because there is no evidence that Butler (1) had problems with PM2; or (2) committed misconduct similar to Stephens' misconduct with Al and Jule Smith. Additionally, Butler worked in a different department than Stephens, and had a different department supervisor.  Accordingly, she was not similarly situated to Stephens, and does not serve as a proper comparator.

**B.      Conclusion and Remaining Arguments**

As discussed above, Stephens fails to identify any similarly situated employees who engaged in nearly identical conduct as he did yet were treated differently.  The failure to identify similarly situated employees, or a replacement from outside one's protected class, does not necessarily doom a plaintiff's prima facie case.  In fact, "courts have occasionally found, in certain circumstances, a prima facie burden to be met despite the absence of comparator evidence. . . . when there is otherwise sufficient circumstantial evidence of discriminatory intent."  *Hunter v. Mobis Ala., LLC*, 559 F. Supp. 2d 1247, 1256 (M.D. Ala. 2008) (Albritton, J.). For example, in *Hunter*, this court found that, despite the fact that the plaintiff presented no comparator evidence, the plaintiff satisfied her prima facie case in a pregnancy discrimination case by presenting evidence (1) of ambiguous comments by one of the plaintiff's superiors that could be interpreted as expressing displeasure with the plaintiff's pregnancy; (2) of rumors around the office that an employee was fired for being pregnant; (3) that an employee told the plaintiff not to tell a superior that the plaintiff was pregnant because she could be fired; and (4)

20

that one of the plaintiff's superiors did not care about plaintiff's frequent absences until after plaintiff became pregnant.  *Id.* at 1257-58; *see also Schoenfeld v. Babbitt*, 168 F.3d 1257, 1267 (11th Cir. 1999) (holding that prima facie case was satisfied, despite lack of comparator evidence, when an employee who was part of the hiring process, but not the ultimate decisionmaker, (1) arguably made a tacit admission that gender was a factor in a hiring decision by stating that "'[i]t was more than [gender];'" (2) requested additional justifications whenever males, not females, were selected for positions; and (3) suggested a specific female applicant for a job instead of the male plaintiff).

In this case, however, Stephens has failed to present evidence suggesting "'some additional factor that would allow an inference of discrimination.'"  *Hunter*, 559 F. Supp. 2d at 1257 (quoting *White v. Verizon S., Inc.*, 299 F. Supp. 2d 1235, 1241 (M.D. Ala. 2003) (Thompson, J.)).  Instead, Stephens' evidence of gender discrimination is entirely centered on the fact that his proffered female comparators were not terminated, but he was.  *See Holifield*, 115 F.3d at 1563 (holding that absent an example of a similarly situated employee, "summary judgment is appropriate where no other evidence of discrimination is present").

Therefore, Stephens has failed to satisfy his prima facie case, and summary judgment is due to be granted to Auburn.  The court need not address whether Auburn has proffered legitimate, nondiscriminatory reasons or whether those reasons are pretextual.

## V.  CONCLUSION

For the foregoing reasons, the Motion for Summary Judgment is GRANTED.

Done this 2nd day of March, 2011

21

/s/ W. Harold Albritton
W. HAROLD ALBRITTON
SENIOR UNITED STATES DISTRICT JUDGE